IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STOCKADE COMPANIES, LLC and STOCKADE FRANCHISING, LP, | § § § § § § § § § § § § | |
| Plaintiffs, | | |
| v. | | 1:17-CV-143-RP |
| KELLY RESTAURANT GROUP, LLC, | | |
| Defendant. | | |

**ORDER**

Before the Court in the above-entitled matter is Plaintiffs' Motion for Preliminary Injunction, (Dkt. 44), on which the Court held two hearings, (Dkts. 76, 83). Having considered the parties' arguments, the case file, and relevant law, the Court concludes that Plaintiffs' motion is **DENIED**.

**I. BACKGROUND AND OVERVIEW**

Plaintiffs Stockade Companies, LLC and Stockade Franchising, LP (collectively, "Plaintiffs" or "Stockade") own and license the trademarks for the Sirloin Stockade, Coyote Canyon, and Montana Mike's restaurants. (Compl., Dkt. 1, ¶ 1). Plaintiffs filed suit against Defendant Kelly Restaurant Group ("KRG" or "Defendant") on February 24, 2017. (Dkt. 1). They subsequently filed a Motion for Preliminary Injunction, which the Court granted in part on May 31, 2017. (Dkt. 26). In that order, the Court directed KRG to de-brand its Sirloin Stockade, Coyote Canyon, and Montana Mike's franchise restaurants within 21 days. (*Id.* at 7). Defendant then rebranded the restaurants in question as "Kansas Buffets."

Plaintiffs filed the instant Motion for Preliminary Injunction on July 28, 2017. (Dkt. 44). They seek an order enjoining Defendant from operating "family-style buffets" at former

1

Stockade restaurants. (*Id.* at 6). Specifically, Plaintiffs ask the Court to enjoin Defendant from "using Stockade's confidential information in violation of the parties' [f]ranchise [a]greements," "misappropriating Stockade's trade secrets in violation of the Texas Uniform Trade Secrets Act," and "infringing on Stockade's trade dress in violation of the Lanham Act." (*Id.*).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief must "carr[y] the burden of persuasion on all four requirements." *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION

Stockade requests three separate types of injunctive relief. It asks the Court to enjoin KRG from (1) using Stockade's confidential information in violation of the parties' franchise agreements, (2) misappropriating Stockade's trade secrets in violation of the Texas Uniform Trade Secrets Act, and (3) infringing on Stockade's trade dress in violation of the Lanham Act. (Mot. Prelim. Inj., Dkt. 44, at 6). The Court will apply the four-part rubric detailed above to each of these requests.

*A. KRG's Alleged Use of Stockade's Confidential Information*

Stockade contends KRG is now "us[ing] Stockade's confidential Buffet System to operate its restaurants" in violation of the franchise agreements signed by both parties. (Mot. Prelim. Inj., Dkt. 44, at 26). In making this breach-of-contract argument, Stockade relies on a section of the franchise agreements that prohibits franchisees—in this case, KRG—from using Stockade's confidential information "in the operation of any other family-style buffet restaurant or family-style steakhouse, or other business which, in [Stockade's] sole discretion, would constitute an unfair method of competition." (Franchise Agreement, Dkt. 27-2, at 18). For the reasons stated below, the Court concludes that Stockade has not demonstrated it is entitled to a preliminary injunction on this claim.

The franchise agreements define "confidential information" as information including, but not limited to,

> menu items and new test menu items, ingredients, recipes, formulas, and methods of preparation and presentation of food products sold at Franchised Restaurants, as well as the methods, techniques, formats, specifications, procedures, information, systems, computer software, and knowledge of and experience in the operation and franchising of Franchised restaurants, and further including, without limitation, any and all of the foregoing that may arise by reason of Franchisor's franchise of, and Franchisee's operation of, the Franchised Restaurant during the term of this Agreement.

(*E.g.*, *id.*).[1] However, Section 7.03 of the franchise agreements excludes from the definition of "confidential information" information that is "generally known and used in the family-style buffet restaurant or family-style restaurant, other than through disclosure (whether deliberate or inadvertent) by Franchisee." (*Id.* at 18–19).

---

[1] The parties provided several Stockade–KRG franchise agreements to the Court. (Dkts. 27-1–27-16). Though the language of these agreements varies slightly, the parties have treated the agreements as functionally identical. The Court does the same.

3

As noted above, Stockade maintains that its entire "buffet system" is confidential information for purposes of the franchise agreements. Stockade defines the "buffet system" broadly and amorphously, describing it as an "operational guide" covering questions including

> How much of each core product should be ordered? How can the number of core products be optimized to produce the 100-plus varieties of food that Sirloin Stockade and Coyote Canyon serve, including specialty nights? How often should each core product be ordered? How do seasonal changes affect ordering? What should be on shelves, refrigerated, or frozen? What kind of freezers, refrigerators, and shelving is optimal? How long can items remain on the shelf, refrigerated or frozen? How is inventory done, and how often? What does Stockade's wholesale food purveyor prepare, and what is prepared in each restaurant? What kitchen equipment is necessary, and how is it maximally arranged for efficiency? How are steaks butchered in-restaurant? What steps are taken to minimize waste or spoilage? What security systems are used to minimize theft? Which specialty items are chosen for each of the specialty nights? When is food disposed of? What are the health regulations for each item of the food? How many wait staffs are appropriate for each . . . party of each work day and each weekend? What are wait staff's duties and what is the optimal level of service? And how are each of these questions so as to lead to a ration of cost-of-goods and labor expenses to revenue that allows for a reasonable return on investment?

(Mot. Prelim. Inj., Dkt. 44, at 30–31). Indeed, when pressed by the Court to describe the "buffet system" and what would qualify as a family-style buffet, Stockade counsel said merely: "You know it when you see it." (Tr., Dkt. 84, at 21).

KRG asserts that Stockade is not entitled to a preliminary injunction with respect to its breach-of-contract claim because it has not demonstrated a breach. The Court, given the evidence now before it, agrees.

It is axiomatic that a party seeking to prevail on a breach-of-contract claim must prove, at a minimum, that the defendant breached a valid contract. *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (identifying the "essential elements" of a breach-of-contract action as (1) the existence of a valid contract, (2) performance or

4

tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach). Here, no parties contest that the contract in question was valid. The issue, rather, is whether KRG breached the contract at all. KRG maintains that it did not, as (1) the franchise agreements expressly exempt information that is "generally known and used in the family-style buffet restaurant or family-style restaurant," and (2) Stockade has not shown that KRG has used any information that does not fall within the general-knowledge exemption.

Stockade, which does not dispute that the general-knowledge exemption applies, seeks to prove the breach by focusing instead on alleged similarities between the "food, layout, design, décor, and other operations" at Stockade-branded restaurants and the restaurants now operated by Defendant as Kansas Buffets. (Mot. Prelim. Inj., Dkt. 44, at 28).[2] Stockade admits, however, that is has no direct evidence of KRG's use of confidential information. (Tr., Dkt. 84, at 56, 63). In the absence of such evidence, Stockade points to circumstantial evidence of the alleged breach.

Stockade highlights, for example, the fact that both its restaurants and the Kansas Buffets operated by Defendant have "specialty nights." (Mot. Prelim. Inj., Dkt. 44, at 20). However, Stockade Chief Operations Officer Rick Pastorek admitted that "a lot of" restaurants have specialty nights, that "anyone that walks off the street can see specialty nights at any restaurant," and that knowledge regarding specialty nights is "something that could be gained in personal knowledge in the industry." (Tr., Dkt. 84, at 61). Mr. Pastorek also testified about his experience visiting KRG's Kansas Buffets. (*Id.* at 39). While he stated

---

[2] Stockade also points to KRG's use of calorie-count identifiers supplied to the former franchises before they were rebranded. (Mot. Prelim. Inj., Dkt. 44, at 18–19). Those identifiers have been removed. (Tr., Dkt. 84, at 180).

5

that the restaurants were "operating the same as they did before they de-identified," (*id.* at 40), he agreed that he had no "personal knowledge or direct evidence that [KRG] is using every single one" of the elements comprising its "buffet system," (*id.* at 56). Although Mr. Pastorek claimed that the food at the Kansas Buffet restaurants "looked the same and tasted the same" as the food served at the restaurants when they were Stockade franchises, he admitted that he was basing his observations "just . . . on the way [the food was] laid out in the buffet." (*Id.* at 63). Mr. Pastorek also admitted that KRG no longer has access to Stockade's research library, the franchise agreements, or disclosure documents; that the point-of-sale system used by Stockade and KRG is used by many restaurants in the industry; and that none of Stockade's recipe developers are working at KRG. (*Id.* at 56–58).

Stockade's final argument regarding KRG's alleged use of Stockade's confidential information involves similarities between the recipes used at the two companies' restaurants. (*See, e.g.*, Dkt. 44-5 at 168–236; Pls.' Exs., Dkt. 85-1, at 93–186). The Kansas Buffet Company recipe book contains 63 recipes. (Transcript, Dkt. 84, at 41). Of those, Stockade considers 12 substantially similar to its own. (Pls.' Exs., Dkt. 85-1, at 162–186). Those recipes—covering standard, widely available fare such as lasagna, beef and noodles, liver and onions, and meatloaf, among other items—are indeed similar. However, changes have been made: KRG's lasagna recipe contains more garlic and sugar; its beef noodles recipe contains less "beef base"; its liver and onions recipe contains more garlic; and its pot roast contains more onion strips. (Pls.' Exs., Dkt. 85-1, at 162–186). While some recipes—like those for a prime beef rub—appear identical, those recipes are exceedingly simple. Both companies' prime beef rub, for example, includes only four ingredients: salt, pepper, garlic, and cumin. (Pls.' Exs., Dkt. 85-1, at 170–71). While the Court is unfamiliar with the beef rub recipe used

at other family-style buffet restaurants, it stands to reason that such simple recipes may appear in many competitors' recipe books.

Evidence regarding Stockade's allegation that KRG's restaurants are serving food made from Stockade recipes boils down to assertions by Stockade employees that food served at Kansas Buffets tastes the same as food served at Stockade-branded eateries. (*See, e.g.*, Tr., Dkt. 84, at 40 ("Most of the things we tried tasted exactly like they did.")). This subjective speculation, when unaccompanied by any direct evidence that KRG is using "confidential information" as defined in the franchise agreements, is insufficient to convince the Court that there is a high likelihood KRG breached its contract with Stockade.[3]

Stockade is therefore unable to demonstrate its entitlement to injunctive relief on this claim. *See PCI Transp.*, 418 F.3d at 54 (explaining that the party seeking injunctive relief must "carr[y] the burden of persuasion on all four requirements"). Stockade's request that the Court enjoin KRG from using Stockade's confidential information in violation of the parties' franchise agreements is **DENIED**.

---

[3] In an effort to convince the Court otherwise, Stockade makes frequent reference to *CiCi Enterprises*, a recent case in which a district court in the Middle District of Florida, applying Texas law, granted a preliminary injunction against a former franchisee that was "continu[ing] to operate a pizza restaurant that [was] nearly identical to the licensed Cicis restaurant they operated previously." *CiCi Enters., LP v. Four Word Motion, LLC*, No. 6:16-CV-1679, 2016 WL 9244626, at *9 (M.D. Fla. Oct. 17, 2016). An opinion from the Middle District of Florida is not binding authority. More importantly, *CiCi Enterprises* is easily distinguishable from the case at hand. In that case, the court was able to conclude that it was "obvious" the defendants were operating their restaurant using proprietary and confidential information because, among other reasons, the plaintiff provided evidence that its "proprietary recipes were posted on the kitchen wall and still being used." *Id.* at *2, *9. Here, Stockade offers only a selection of similar recipes and speculation that the food being served at Kansas Buffets tastes the same as food served at Stockade franchises.

*B. KRG's Alleged Misappropriation of Stockade's Trade Secrets*

Stockade also seeks an injunction enjoining KRG from misappropriating Stockade's trade secrets in violation of the Texas Uniform Trade Secrets Act. For the reasons detailed below, the Court **DENIES** that request.

Under Texas law, trade secret misappropriation is established by showing that (1) a trade secret existed, (2) the defendant acquired the trade secret through a breach of a confidential relationship or discovered it by otherwise improper means, and (3) the defendant used the trade secret without authorization from the plaintiff. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013) (quoting *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994)); *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. 1:14-CA-847, 2016 WL 900577, at *3 (W.D. Tex. Mar. 2, 2016). Trade secrets are defined as

> information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that: (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tex. Civ. Prac. & Rem. Code § 134A.002(6)(A).

Stockade alleges that its "buffet system" constitutes "protectable trade secrets under Texas law." (Mot. Prelim. Inj., Dkt. 44, at 30; Tr., Dkt. 84, at 54). As noted above, Stockade defines the "buffet system" broadly. *See supra* Part III.A.1. For example, Mr. Pastorek testified that the system was "the recipes, the manuals, the training materials, our staff . . . all of our vice president[s], directors that help operate the franchises and develop systems and process[es] to help us operate our restaurants." (Tr., Dkt. 84, at 31; *id.* at 54 (defining Stockade's trade secret as "being comprised of certain elements," including recipes, the

8

training system, trade dress, trademarks, the resource library, the marketing program, the purchasing system, the point-of-sale system, the gift-card system, and research and development)). When pressed to more precisely define the buffet system, Mr. Pastorek said: "It's everything." (*Id.* at 31).

Even assuming that this indeterminate laundry list of elements comprises a "trade secret," Stockade must still show that KRG acquired the trade secret through a breach of a confidential relationship or discovered it by otherwise improper means. It has not met that burden. Stockade concedes that KRG no longer has access to its resource library and that KRG's franchises returned Stockade's manuals. (*Id.* at 131). Indeed, Mr. Pastorek admitted during his testimony that KRG is not using Stockade's buffet system "in its entirety." (*Id.* at 70). Stockade's assertion that KRG acquired its trade secret through a breach of a confidential relationship is further undercut by KRG's evidence that Stockade disposed of this allegedly secret information by throwing the documents—including recipes—into a public, unlocked dumpster. (*Id.* at 170–72).[4] As such, the Court cannot conclude that there is a high likelihood Stockade will demonstrate KRG acquired the trade secret through a breach of a confidential relationship or discovered it by otherwise improper means. Because doing so is necessary to establish a claim for misappropriation of trade secrets, Stockade's request that the Court enjoin KRG from misappropriating Stockade's trade secrets in violation of the Texas Uniform Trade Secrets is **DENIED**.

---

[4] Moreover, despite a provision in the franchise agreements allowing it to do so, Stockade did not require the franchises in question to require employees to sign confidentiality and noncompete agreements. (Tr., Dkt. 84, at 88–91). As KRG notes, that means any employee who has left those franchises could have put knowledge of the "buffet system" to work for a competitor.

*C. KRG's Alleged Infringement of Stockade's Trade Dress*

Stockade finally argues that it is entitled to an order enjoining KRG from infringing on Stockade's trade dress in violation of the Lanham Act. For the reasons detailed below, the Court disagrees.

"Trade dress" refers to the "total image and overall appearance of a product" and "may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Amazing Shapes, Inc. v. Metro Mini Storage*, 608 F.3d 225, 250–51 (5th Cir. 2010) (citing *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998)). The Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, protects trade dress from infringement by competitors. To succeed on an infringement or unfair competition claim under the Lanham Act, a plaintiff must establish two elements. First, the plaintiff must establish "that the mark or trade dress, as the case may be, qualifies for protection." *Pebble Beach*, 155 F.3d at 536. To qualify for legal protection, the trade dress must be inherently distinctive or have achieved secondary meaning in the public's mind; that is, it must have "come through use to be uniquely associated with a specific source." *Id.* (internal quotation marks and citations omitted). Second, the plaintiff must show that the defendant's use of the trade dress creates "a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship" of the defendant's product or service. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008) (internal quotation marks and citations omitted).

Given the evidence now before it, the Court concludes that Stockade has not established a high likelihood of success on either of the elements described above. Stockade alleges that it "uses distinctive designs, décor, artifacts, and signage for its restaurants, all of

which KRG continues to use in the Kansas Buffets." (Mot. Prelim. Inj., Dkt. 44, at 33). However, it offered as evidence only pictures of KRG's current restaurants, (Pls.' Exs., Dkt. 85-3, at 1–9), making it impossible for the Court to compare those sites to Stockade franchises. Stockade representatives also admitted that there is no uniform color palate among its franchises, whether with respect to color palette, furniture, exterior décor, or the ratio of hot bars to cold bars.[5] (Tr., Dkt. 84, at 133–34). It therefore cannot be said that Stockade's trade dress, as currently presented to the Court, is inherently distinctive. *Cf. CiCi Enters.*, 2016 WL 9244626, at *5 (granting a preliminary injunction with respect to trade dress infringement because the plaintiff "employ[ed] a specific color palette and décor" and consistently used a "specific decorative scheme . . . throughout all of its franchises").

Stockade also has not shown that KRG's use of its trade dress creates a likelihood of confusion in the minds of potential customers. Stockade offered some evidence of confusion, primarily in the form of social media posts or customer complaints about KRG-owned restaurants that were directed to Stockade's website. (Mot. Prelim. Inj., Dkt. 44, at 7; Tr., Dkt. 84, at 136). However, it is not readily apparent that the customer confusion in question was caused by KRG. KRG elicited testimony that (1) Stockade was responsible for closing Facebook and Twitter accounts listing the former franchises as Stockade restaurants, and (2) Stockade failed to take that action. (*Id.* at 139–40). Indeed, it appears Stockade itself sent marketing emails to customers that listed the KRG-owned locations as Stockade-owned restaurants. (*Id.* at 141–43).

---

[5] Stockade also alleged that its buffet layout was "a big part of its method," but admitted that the layout is functional. (Tr., Dkt. 84, at 63–64). Trade dress is only entitled to legal protection if it is non-functional. *Pebble Beach*, 155 F.3d at 536.

11

The Court concludes that Stockade has not established a high likelihood of success with respect to either of the elements required to succeed on an infringement or unfair competition claim. Stockade's request for an order enjoining KRG from infringing on Stockade's trade dress in violation of the Lanham Act is therefore **DENIED**.

## IV. CONCLUSION

Stockade has not demonstrated a high likelihood of success on any of its three claims. Plaintiffs' Motion for Preliminary Injunction, (Dkt. 44), is **DENIED** in full.

**SIGNED** on October 16, 2017.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE